IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TYRONE DILLARD II, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-04396 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tyrone Dillard II sues pro se under 42 U.S.C. § 1983, alleging that Defendants, Officer Clifford Martin Jr., Officer Mayklae Ingram, and the City of Chicago, violated his Fourth Amendment rights when the Officer Defendants stopped him, searched his bag, took his weapon, and subsequently arrested him, [1]. Defendants collectively move to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6), *see* [25]. For the reasons explained below, this Court grants Defendants' motion.

## I. Background

### A. Plaintiff's Allegations

On August 25, 2023, Plaintiff crossed South Wentworth Street in front of his house in Chicago, and then he went to speak with his brother and his brother's wife, who were sitting in a car parked at the curb. [1] at 2–3; [32] at 2. At the time, Plaintiff wore a crossbody bag with its strap across his shoulder. [1] at 3; [32] at 3.

Officers Martin and Ingram, driving down South Wentworth at the time, spotted Plaintiff, who was standing in the street, and "initiated a *Terry* stop without probable cause" as they approached. [1] at 2. Specifically, Plaintiff alleges that the officers stopped their unmarked car and approached Plaintiff, [32] at 3, and even though he behaved "lawfully" and was not engaged in "criminal activity," Officer Martin requested Plaintiff's identification. [1] at 2. Plaintiff further alleges that he handed over his ID because he did not think he was "free to go," and the officers then began to pat Plaintiff down; one of the officers reached into Plaintiff's bag and found a black Glock 27 handgun. *Id.* at 2–3. The officers ran a criminal check on Plaintiff at the scene, which revealed that Plaintiff was a convicted felon. *Id.*; [32] at 3.

Plaintiff submitted a pro se complaint on May 29, 2024, claiming that the officers' search and seizure violated his rights under the Fourth Amendment, [1]. Plaintiff's complaint also mentions malicious prosecution and cruel and unusual punishment (both tied to the allegedly unlawful search and seizure), and he seeks $1 million in compensatory damages and $1 million in punitive damages from each Defendant. *Id.*

This recitation comprises the sum total of the allegations in Plaintiff's complaint [1], as clarified in his response to the motion to dismiss, [32].[1]

---

[1] As discussed below, however, the August 25, 2023 incident was also captured by the Officers' body worn cameras, and the Defendants now move to dismiss Plaintiff's complaint, [25], in large part, based upon the video and audio footage, which they attach to their motion, *see* [26], [27].

### B.    The Officers' Body Worn Camera Footage

Before turning to the merits of the parties' arguments on dismissal, the Court must discuss the Officers' body worn camera (BWC) footage, including the propriety of considering it at this stage of the proceedings.

On a motion to dismiss, a court must accept allegations as true and "construe all inferences in the plaintiff's favor." *Forrest v. Universal Savings Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). In doing so, a court may also "consider any facts set forth in the complaint that undermine the plaintiff's claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). This includes exhibits attached to the complaint or referenced therein, "if they are central to the claim." *Id.*

In some cases, determining whether a video or exhibit remains "central to the claim" can be challenging. *See, e.g., Brown v. City of Chi.*, 21-cv-1397, 2022 WL 865796, at *3–5 (N.D. Ill. Mar. 23, 2022) (declining to consider body camera footage that plaintiff did not attach to his complaint and that does not show the entire incident); *Hyung Seok Koh v. Graf*, No. 11-cv-2605, 2013 WL 5348326, at *9 (N.D. Ill. Sept. 24, 2013) (considering footage of a police interrogation on a motion to dismiss where the footage captured most of the questioning and the interrogation was central to the plaintiff's claims). This matter, however, is not one of the challenging cases.

Here, Plaintiff's entire complaint remains predicated upon his brief encounter with the Defendant officers (which he describes in his allegations), and the BWC depiction of those events remains central to his claim (Plaintiff even mentions the video himself, [1] at 3). Indeed, to prevail at this stage, Plaintiff must make a

plausible showing that in this encounter the officers lacked a constitutionally sufficient basis to approach him, ask for his ID, and/or later retrieve his gun.[2] Consequently, in this case, the BWC footage documenting the encounter may properly be considered, even on a motion to dismiss. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (recognizing that the aim of the exception allowing courts to consider documents central to a claim "is to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents.").

Moreover, this Court may also take judicial notice of "facts in the public record that are 'not subject to reasonable dispute' and 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Johnson v. McDonald*, No. 23 C 3200, 2025 WL 965703, at *2 (N.D. Ill. Mar. 31, 2025) (quoting Fed. R. Evid. 201(b)(2)). Thus, even at this early stage of the proceedings, where the officers' body worn camera footage "utterly discredits" the plaintiff's account, the trial court need not "afford customary deference to the non-movant's averments." *Id.* (quoting *Luczynski v. Joroan*, No. 23-cv-17184, 2024 WL 3106101, at *2 (N.D. Ill. June 24, 2024); *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)). The Seventh Circuit has explicitly instructed that "when the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d

---

[2] Even though Plaintiff alleges that he committed no crime and that the officers approached him and searched his bag without probable cause, such allegations remain legal conclusions, which this Court need not accept. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

936, 942 (7th Cir. 2016). As a result, the Court may also take judicial notice of the video when assessing the plausibility of Plaintiff's claims. *See also Bogie*, 705 F.3d at 609 (if "an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.") (citing *Forrest*, 507 F.3d at 542); *Esco v. City of Chicago*, 651 F. Supp. 3d 917, 919–20 (N.D. Ill. 2023), *aff'd*, 107 F.4th 673 (7th Cir. 2024) (courts remain "free to consider any facts set forth in the complaint that undermine the plaintiff's claim, including documents or other materials referenced in the pleading if they are central to the claim, including video footage that shows in real time the content and context of the alleged wrongs.").

In his response to the motion to dismiss, Plaintiff suggests that the submitted BWC footage remains incomplete and fails to show "the incident before the arrest, where officers were violating citizens right the entire day by jumping out the car without probable cause violating citizens rights without probable cause." [32] at 2. But any recordings showing the officers' conduct in earlier encounters with unnamed individuals who are not parties to this case, even if they exist, have no bearing on the question of whether the officers violated Plaintiff's rights in the encounter from which Plaintiff's claim stems. And this Court's careful review of the officers' BWC footage (which consists of recordings from all three officers' cameras) confirms that the exhibits capture the entire encounter, including the audio, from the moment the officers' car pulled up, through the moment Plaintiff was handcuffed and placed into the squad car, to the moment when the officers got back into their vehicle. In short,

to the extent Plaintiff challenges the completeness or accuracy of the relevant footage, his challenge remains unfounded.

Having determined that it may properly consider the BWC footage, this Court turns to the substance of the recordings themselves, which directly contradict many of Plaintiff's allegations and undermine his Fourth Amendment claim.

First, the BWC footage confirms Plaintiff's allegation that the Officers conducted a *Terry* stop[3] on August 25, 2023. The footage shows that, at 11: 19 a.m. on August 25, 2023, Officer Ingram was riding in the front passenger seat, and Officer Martin was riding in the back seat, of a vehicle being driven by Officer Parker (who Plaintiff has not sued). Officer Ingram's BWC footage shows the Officers' car turned onto Wentworth, where Plaintiff is immediately visible, standing in the street (where car traffic would flow) while leaning into a car without a handicapped placard, which was itself parked at the curb between signs designating the spot as a handicapped-only parking spot. Plaintiff wore what appears to be a Louis Vuitton crossbody bag and is seen holding his phone in his hand. Based upon the apparent traffic violations, the officers approached.

Next, the BWC recorded the ensuing encounter. Specifically, Officer Parker asked the individual sitting in the driver seat of the parked car (Plaintiff's brother) whether he had a handicap placard, and the individual answered, "no." Officer Martin immediately asked Plaintiff if he had an ID on him; Plaintiff pulled out his wallet and flipped it open. Officer Martin then asked him to remove the ID from his

---

[3] The Court defines and discusses *Terry* stops below.

wallet, and he also asked Plaintiff if he had a weapon on him. In response, Plaintiff indicated that he did and moved his hand toward his bag retrieve it; Officer Martin then said, "no" and instead asked Plaintiff if he's got something in his bag, to which Plaintiff said, "yes sir." Officer Martin then placed Plaintiff in handcuffs for safety purposes, unzipped the bag, and retrieved the gun exactly where Plaintiff indicated it would be. Officer Martin then asked Plaintiff if he had anything else on him, Plaintiff said, "no," and Officer Martin told Plaintiff that he appreciated Plaintiff's honesty. The Officers and Plaintiff remained civil and conversational throughout the encounter.

Finally, the BWC recorded the officers' immediate follow-up investigation. Based upon the recovery of the firearm, Officer Martin provided Plaintiff's ID number to other law enforcement personnel on his radio and, while he waited for information, he asked Plaintiff if he was on parole; Plaintiff indicated that he was not on parole. Via the radio, however, the dispatcher then relayed that Plaintiff had "no valid DL," and that he was, in fact, on parole and was a convicted gun offender who needed to register annually. At this point, the Officers then placed Plaintiff under arrest, allowed him to remove his jewelry (giving it, along with his car keys, to Plaintiff's female companion, who arrived on the scene while the officers were still speaking to Plaintiff). Officer Ingram placed Plaintiff in a squad car, at 11:27 a.m., and returned to the officers' car at 11:29 a.m. The entire encounter lasted no more than ten minutes.

Based upon the BWC footage, Defendants argue that Plaintiff's Fourth Amendment claim fails as a matter of law and should thus be dismissed under Rule 12(b)(6), [25]. They also argue that they are entitled to qualified immunity, *id*.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), and that the defendant has "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must contain "sufficient factual matter" to state a facially plausible claim to relief. *Id.* (quoting *Twombly*, 550 U.S. at 556, 570). A plaintiff need not plead "detailed factual allegations" but still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for the complaint to suffice. *Id.*; *see Brooks v. Ross*, 578 F.3d 574, 581–82 (7th Cir. 2009). Courts also liberally construe pro se complaints and hold them to a less stringent standard than filings drafted by counsel. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011); *Beal v. Beller*, 847 F.3d 897, 902 (7th Cir. 2017). In addition to the proper consideration of the BWC as discussed above, this Court has applied the requisite standard.

## III.    Discussion & Analysis

Section 1983 imposes liability on any "person" who, while acting under color of state law, deprives an individual of federally protected rights. 42 U.S.C. § 1983.  *See also Sabo v. Erickson*, 128 F.4th 836, 845 (7th Cir. 2025) (to state a claim under § 1983, a plaintiff must allege that his constitutional rights were violated by a state official acting under color of law).  Plaintiff's allegations confirm that the Defendant Officers acted, at all times relevant, under color of state law.  For present purposes, therefore, the relevant question is whether his allegations plausibly claim a violation of the Fourth Amendment.

### A.    Plaintiff's Fourth Amendment Claim

Plaintiff claims that the Defendant Officers violated his rights under the Fourth Amendment when they approached him, asked for his ID, searched him, seized his gun, and thereafter arrested him, all allegedly without probable cause.  *See* [1].  The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  This amendment, of course, does not proscribe *all* searches and seizures, but rather only the *unreasonable* ones.  *U.S. v. Sharpe*, 470 U.S. 675, 682 (1985).

Generally, a search or seizure is unreasonable if not based upon probable cause.  *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (citing *Dunaway v. New York*, 442 U.S. 200, 213 (1979)).  The Supreme Court created an exception to this rule in *Terry v. Ohio*, 392 U.S. 1 (1968), however.  Under *Terry*, "police officers

9

may briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot." *Eymann*, 962 F.3d at 282 (citing *Terry*, 392 U.S. at 21–22). "Reasonable suspicion demands 'only a minimal level of objective justification,' which is something 'more than a hunch but less than probable cause' and significantly less than a preponderance of the evidence." *United States v. Olson*, 41 F.4th 792, 800 (7th Cir. 2022) (*United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019); *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016); *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000)). "Reasonable suspicion amounts to an 'objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.'" *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) (quoting *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)). To determine whether reasonable suspicion exists, courts "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Viewing the allegations and the BWC footage in the light most favorable to Plaintiff, there can be no question that the Officers conducted a *Terry* stop, and then later a full custodial arrest. But the audio and video captured in the BWC footage also show that the initial investigative stop, and the resulting probable cause arrest, were both reasonable under the Fourth Amendment.

Under *Terry*, the constitution permits an "investigative stop" and "brief detention" to give officers a "chance to verify (or dispel) well-founded suspicions that

a person has been, is, or is about to be engaged in criminal activity.'" *United States v. Bullock*, 632 F.3d 1004, 1014–15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir.1995)). For an "investigative stop based upon reasonable suspicion to pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *Id.* (citing *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994); *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985)). Legitimate purposes of a *Terry* stop may include "ensuring the safety of the officers or others." *Rabin v. Flynn*, 725 F.3d 628, 633 (7th Cir. 2013).

In this case, the BWC footage undermines Plaintiff's suggestion that the initial investigative stop violated the Fourth Amendment. As discussed above, when the officers pulled onto Wentworth, they saw a car (without a handicapped placard) parked in a handicapped spot, between two signs designating that specific spot as a handicapped spot. They also saw Plaintiff standing in the street obstructing traffic, as he spoke with individuals in that car. Furthermore, upon approach, Officer Parker asked Plaintiff's brother, who was sitting in the driver's seat, if he had a placard, and Plaintiff's brother admitted that he did not.

Based upon the objective facts, the Officers possessed reasonable suspicion to believe that Plaintiff (and his brother) were violating the law. For example, the officers had reason to believe that Plaintiff was, among other things, violating Chicago Municipal Code § 9-80-180, which provides that:

> "any person who shall willfully and unnecessarily hinder, obstruct or delay or who shall willfully and unnecessarily attempt to hinder, obstruct or delay any other person in lawfully driving or travelling along or upon any street or who shall offer to barter or sell any merchandise or service on the street so as to interfere with the effective movement of traffic or who shall repeatedly cause motor vehicles travelling on public thoroughfares to stop or impede the flow of traffic shall be guilty of a misdemeanor and upon conviction thereof shall be fined not more than $200.00 or imprisoned for not more than ten days, or both, for the first offense . . . ."

Likewise, the officers reasonably believed Plaintiff's brother was violating Illinois law, which prohibits parking:

> "any motor vehicle which is not properly displaying registration plates or decals issued to a person with disabilities, as defined by Section 1-159.1, pursuant to Sections 3-616, 11-1301.1 or 11-1301.2, or to a veteran with a disability pursuant to Section 3-609 of this Act, as evidence that the vehicle is operated by or for a person with disabilities or a veteran with a disability, in any parking place, including any private or public off-street parking facility, specifically reserved, by the posting of an official sign as designated under Section 11-301, for motor vehicles displaying such registration plates."

625 ILL. CMP. STAT. 5/11-1301.3(a). Under both theories, the Officers reasonably approached Plaintiff (and his brother) to investigate the apparent violations.

Thereafter, during the stop, the officers' initial conduct remained reasonable under *Terry*,[4] and this included the police officers asking basic safety questions about the presence of dangerous weapons on the scene and running warrant checks. *United States v. Snow*, 656 F.3d 498, 501 (7th Cir. 2011) ("*Terry* recognizes the authority of

---

[4] Contrary to the Plaintiff's theory, merely "asking for identification does not amount to a seizure under the Fourth Amendment." *Hall v. City of Chicago*, 953 F.3d 945, 951 (7th Cir. 2020). Indeed, in "the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment"; and "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 185–86 (2004) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)).

an officer conducting an investigatory stop to take reasonable steps to assure the safety of himself and others."); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop'" and such questioning can "involve checking the driver's license," and "determining whether there are outstanding warrants" [among other topics].); *United States v. Walls*, 759 F. Supp. 3d 858, 867 (N.D. Ill. 2024) ("For officer safety, officers routinely ask about the presence of a gun at a traffic stop without the need of *Miranda* warnings."); *United States v. Lyons*, 856 F. Supp. 2d 946, 956 (C.D. Ill. 2012) (officer "was entitled to ask Defendant if he had a gun" during a traffic stop); *United States v. Muriel*, 418 F.3d 720, 726 (7th Cir. 2005) ("as part of the stop, police may ask the vehicle's occupants 'a moderate number of questions' and request their identification.").

Moreover, once Plaintiff voluntarily admitted that he was currently in possession of a weapon, the police officers remained justified in placing him in handcuffs, searching the location Plaintiff indicated, and securing the gun themselves. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 689 n.1 (1985) (recognizing the special law enforcement need of conducting a protective weapons search based upon reasonable suspicion) (citing *Adams v. Williams*, 407 U.S. 143 (1972)); *United States v. Edwards*, 161 F.4th 1088, 1097 (7th Cir. 2025) ("when officer safety is in question or a weapon may be present," officers may draw their weapons and use a degree of force—including handcuffing the suspect—without converting a *Terry* stop into a de facto arrest") (citing *United States v. Olson*, 41 F. 4th 792, 799

(7th Cir. 2022)); *United States v. Tilmon*, 19 F.3d 1221, 1226 (7th Cir. 1994) (court found the use of handcuffs and drawn weapons did not convert a *Terry* stop into an arrest, and then held that to "require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*."); *United States v. Wilson,* 2 F.3d at 231 (upholding use of handcuffs in investigatory stop); *Tom v. Voida,* 963 F.2d 952, 957–58 (7th Cir. 1992) (upholding use of handcuffs in investigatory stop); *United States v. Glenna,* 878 F.2d 967, 972 (7th Cir. 1989) (handcuffing was permissible as part of a *Terry* stop where police dispatch indicated defendants were in possession of weapons).

After the lawful recovery of the weapon, the police officers possessed probable cause to arrest Plaintiff when, moments later, the ID check confirmed his status as a convicted felon. *See Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) (Probable cause to arrest exists if an officer "has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime."); 720 ILL. COMP. STAT. 5/24–1.1(a) ("It is unlawful for a person to knowingly possess on or about his person . . . any weapon prohibited under Section 24–1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction."); Ill. Admin. Code tit. 20 § 1610.20 (providing that only those convicted of felonies are eligible for parole). *See also* 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce, or possess in or

14

affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."); *United States v. Gay*, 98 F.4th 843, 844 (7th Cir. 2024), reh'g denied, No. 23-2097, 2024 WL 3816648 (7th Cir. Aug. 14, 2024) ("Because of his felony convictions, Gay is forbidden to possess either firearms or ammunition.").

The existence of probable cause at this point in the encounter dooms the Plaintiff's case. *See Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (If probable cause exists for a § 1983 unlawful arrest claim, a defendant may assert it to defeat the cause of action) (citing *Jones by Jones v. Webb*, 45 F.3d 178, 181 (7th Cir. 1995)); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("Probable cause acts as an absolute bar to a claim for false arrest.") (citing *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010)).

In short, considering the totality of the circumstances, the initial *Terry* stop and routine questioning, as well as the lawful recovery of the gun and Plaintiff's resulting arrest based upon probable cause, all pass constitutional muster; and Plaintiff's constitutional claim to the contrary remains implausible.

## B.    Qualified Immunity

Even though this Court finds the police officers possessed the necessary reasonable suspicion to justify their initial *Terry* stop, Plaintiff's claim would still fail based upon qualified immunity, even if they were mistaken about their initial determination that Plaintiff (or his brother) were committing traffic violations.[5]

---

[5] There is no dispute between the parties that later, after recovery of the firearm and confirmation of his status as a convicted felon, the police officers would certainly possess probable cause to arrest

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity functions as a defense to suit, rather than just liability, and must be addressed as early as possible. *Rusinowski v. Vill. of Hillside*, 835 F.Supp.2d 641, 650 (N.D. Ill. 2011). Although a plaintiff need not plead around the defense in his complaint, *see, e.g., Rosas v. Bd. of Educ. of City of Chicago*, 652 F.Supp.3d 951, 965 (N.D. Ill. 2023); *Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021), once a defendant raises qualified immunity, a plaintiff bears the burden of disproving the defense. *Euring v. City of Chicago*, No. 25-cv-3322 2025 WL 3210397, at *3 (N.D. Ill. Nov. 17, 2025). A plaintiff may do this only by plausibly alleging in his complaint a violation of a clearly established constitutional right. *Id.*

As explained above, the Court finds that Plaintiff has not plausibly alleged any violation of the Fourth Amendment. As Defendants state in their motion, the officers had "reasonable articulable suspicion that Plaintiff was obstructing traffic (a violation of the Chicago Municipal Code) and that the vehicle he was standing next to was unlawfully parked," a violation of Illinois law. [25] at 5. Nevertheless, even if the Officers were wrong in these assessments, they remain immune from suit. *Pearson*, 555 U.S. at 231. ("immunity covers mere mistakes in judgment, whether the

---

Plaintiff for a firearms offense. Instead, here, Plaintiff disputes the lawfulness of the officers' initial approach, which he claims, constituted the moment of arrest (an alleged version of events undermined by the BWC recordings, as discussed above).

mistake is one of fact or one of law"). Thus, even if Plaintiff was not, in fact, violating Chicago Municipal Code § 9-80-180, and even if his brother's car was not illegally parked, the Defendant Officers remain entitled to qualified immunity, and Plaintiff's Fourth Amendment claim fails as a matter of law.

### C.    Plaintiff's Other Claims

While the crux of Plaintiff's complaint lies in his Fourth Amendment claim, he also alleges malicious prosecution and violations of the Eighth and Fourteenth Amendments; he also seeks indemnification from the City of Chicago. These claims, however, fail as well.

First, the allegations in support of his malicious prosecution and cruel and unusual punishment claims remain tethered to Plaintiff's flawed Fourth Amendment claim. He alleges, for example, that his detention in Cook County Jail, after being arrested on August 25, 2023, constituted cruel and unusual punishment and malicious prosecution because he was arrested unconstitutionally. [1] at 3; [32] at 9. Because Plaintiff's Fourth Amendment theory fails, these claims fail too.

Plaintiff also claims the Defendant Officers (who are African American) singled him out because of his race. The Fourteenth Amendment, among other things, assures that all persons will enjoy "equal protection of the laws." U.S. CONST. amend. XIV, § 1. An equal protection violation in the Fourteenth Amendment involves the singling out a person for different treatment with no rational basis typically due to a particular protected characteristic, such as race, national origin, or sex. *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013). To state a claim of racial profiling,

a plaintiff must allege facts to suggest that defendants were motivated by a discriminatory purpose and had a discriminatory effect. *Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001). In his complaint, Plaintiff simply writes "I'm a young African American male and both officers racially profile…." [1] at 3. These allegations, however, remain conclusory, and "unsupported conclusory factual allegations do not state a § 1983 claim." *Mong v. McKenzie*, No. 21 CV 2420, 2023 WL 7629667, at *2 (N.D. Ill. Nov. 14, 2023). *See also Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021) ("A claim is plausible where a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Iqbal*, 556 U.S. at 678).

Finally, because the Court dismisses Plaintiff's substantive claims against the Officers, it also dismisses any indemnification claim against the City. *See* 745 ILCS § 10/2–109 ("a local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable"); *Kailin as next friend of Kailin v. Metcalf*, No. 19 C 4703, 2020 WL 1139259, at *1 (N.D. Ill. Mar. 9, 2020) (dismissing respondeat superior and indemnification claims against the Village because all underlying claims were dismissed).

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motion to dismiss, [25], and dismisses Plaintiff's complaint. Additionally, because the record (including the body worn camera footage) demonstrates that any further amendment would be futile, this Court declines to grant Plaintiff further opportunity to amend,

18

and dismisses this case with prejudice. *See, e.g., Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 520 (7th Cir. 2015). Civil case terminated.

Dated: February 19, 2026                    Entered:

John Robert Blakey
United States District Judge